**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |
|---|
| In re:<br><br>    Unique Third Avene LLC, *et al.*,[1]<br><br>                               Debtors. |

**FOR PUBLICATION**

Chapter 11

Case No. 25-12461 (JPM)
Jointly Administered

***APPEARANCES***

**BACKENROTH FRANKEL & KRINSKY, LLP**
*Counsel for the Debtors*
488 Madison Ave., 23rd Floor
New York, NY 10022
By: Mark A. Frankel

**CHAPMAN AND CUTLER LLP**
*Counsel for Creditor Bank of America, N.A.*
1270 Avenue of the Americas, 30th Floor
New York, NY 10020
By: J. Alex Kress

**UNITED STATES TRUSTEE**
*Office of the U.S. Trustee, Region 2*
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004
By: Annie Wells

### MEMORANDUM OPINION AND ORDER DENYING DEBTORS' MOTION FOR DETERMINATION THAT THE APPOINTMENT OF A PATIENT CARE OMBUDSMAN IS NOT NECESSARY

---

[1] The consolidated cases are: *In re Unique Third Avenue LLC*, No. 25-12461 (JPM) (Bankr S.D.N.Y. filed Nov. 13, 2025); *In re Third Avenue Imaging LLC*, No. 25-12462 (JPM) (Bankr. S.D.N.Y. filed Nov. 13, 2025); *In re Unique Imaging Services LLC*, No. 25-12463 (JPM) (Bankr. S.D.N.Y. filed Nov. 13, 2025); and *In re Distinguished Diagnostic Imaging*, P.C., No. 25-12464 (JPM) (Bankr. S.D.N.Y. filed Nov. 13, 2025).

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

This is a jointly administered Chapter 11 case of the debtors Unique Third Avenue LLC ("**UTA**"), Third Avenue Imaging LLC ("**TAI**"), Unique Imaging Services LLC ("**UIS**"), and Distinguished Diagnostic Imaging, P.C. ("**DDI**") (collectively, the "**Debtors**").  Before the Court is the Debtors' motion (the "**Motion**"), dated November 13, 2025, seeking a determination that the appointment of a patient care ombudsman is unnecessary.  (Dkt. No. 12).

On December 12, 2025, the United States Trustee (the "**Trustee**") filed an objection (the "**Objection**").  (Dkt. No. 31).  The Trustee argues that, absent an ombudsman, the quality of the Debtors' healthcare services may deteriorate to the detriment of patients, and that the Debtors have failed to demonstrate the existence of a substitute program to safeguard patient welfare.  (*Id.*)

A hearing on the Motion was held on December 19, 2025 (the "**Hearing**").  At the Hearing, Bank of America, N.A. (the "**Bank**") appeared and stated its support for the Trustee's Objection.

The Court has reviewed all relevant filings, the arguments presented at the Hearing, and the record as a whole.  For the reasons set forth below, the Motion is **DENIED**.

## II.    BACKGROUND

### A.  FACTUAL BACKGROUND

The Debtors are related corporate entities with principal offices in the South Bronx, New York.  (Dkt. No. 1).  They collectively operate a physician-based diagnostic imaging business providing X-ray, MRI, and mammography services, and are licensed by the New York State Department of Health.  (Dkt. No. 31, ¶ 6).

In February 2017, the Bank extended a $5,240,000 term loan to TAI (the "**TAI Loan**") and a $4,960,000 term loan to UTA (the "**UTA Loan**").  (Dkt. No. 20, ¶ 1).  In connection with those

loans, the Debtors granted the Bank a first-priority lien on substantially all business assets and a mortgage on certain UTA real property in Bronx County.  (Dkt. No. 13, ¶ 3; Dkt. No. 20, ¶¶ 1, 13).  Each Debtor guaranteed the obligations.  (Dkt. No. 20, ¶ 2).

On November 1, 2019, the Debtors defaulted on the TAI Loan.  (Dkt. No. 20, ¶ 1).  In a subsequent federal diversity action, the U.S. District Court for the Southern District of New York (the "**District Court**") granted summary judgment for the Bank on June 5, 2023, holding that TAI breached the loan agreement and that the co-Debtors were jointly and severally liable under their guaranties.  *See Bank of America, N.A. v. Third Avenue Imaging LLC*, No. 21-cv-5201-VB (S.D.N.Y. June 5, 2023) (Dkt. No. 88).  On March 8, 2024, the District Court entered judgment in the amount of $2,699,933.82 against TAI, UTA, UIS, and its principal owner Joel Reisman, and $3,119,263.07 against DDI.  (Dkt. No. 20, ¶ 2).

Separately, on April 5, 2023, the Bank commenced a foreclosure action against UTA in the Supreme Court of the State of New York, Bronx County (the "**State Court**").  *See Bank of America N.A. v. Unique Third Ave. LLC, et al*., No. 805445-2023E (N.Y. Sup. Bronx Cty. Apr. 5, 2023).  (Dkt. No. 20, ¶ 3).  On July 10, 2025, the State Court granted summary judgment for the Bank.  (*Id*.)  On October 29, 2025, the referee in the foreclosure proceeding filed a report calculating the Debtors' obligation to the Bank at $6,684,696.61, plus interest, arising from the defaults on the UTA Loan.  (*Id*.)

## B. PROCEDURAL POSTURE AND PARTIES' ARGUMENTS

On November 4, 2025, each of the Debtors filed a voluntary Chapter 11 petition in this Court.  (Dkt. No. 1).  No trustee has been appointed; the Debtors retain control of their businesses and estate assets as debtors-in-possession.  (*Id*.)  On November 5, 2025, the Court ordered joint administration of the four cases under the above-captioned case number.  (Dkt. No. 4).

3

In their schedules, the Debtors report the Bank as holding a secured claim of $11,429,935.00, supported by collateral valued at $3,261,747.00. (Dkt. No. 1, Schedule D). The Bank is scheduled as UTA's sole secured creditor, while TAI, UIS, and DDI each scheduled secured creditors other than the Bank. (*Id.*)

On November 13, 2025, the Debtors filed the instant Motion. (Dkt. No. 12). The Motion seeks entry of an order "finding that the appointment of a patient care ombudsman is not necessary" under 11 U.S.C. § 333. (*Id.*) The Debtors contend that an ombudsman is unnecessary because the Debtors' operations "present no risk to patient health or safety," emphasizing that their "imaging process is non-invasive, brief, performed by licensed technologists under established protocols," and do not involve "anesthesia, controlled substances, or emergency procedures[.]" (*Id.* ¶¶ 11-12). The Debtors further submit the declaration of their chief revenue officer, Mr. Nik Lavrinoff, who attests that the Debtors "perform only diagnostic imaging [without] ongoing treatment," that "all patient data are stored off-site on encrypted servers maintained by a HIPAA-complaint vendor," and that the "operations [have] continue[d] uninterrupted." (*Id.* ¶ 18). Against this backdrop, the Debtors argue that appointing an ombudsman "would impose unnecessary administrative expense with no discernable corresponding benefit to patient welfare." (*Id.* ¶ 17).

The Trustee objects, asserting that the Debtors have not met their burden to demonstrate that appointment is unnecessary under § 333. (Dkt. No. 31). The Trustee advances three principal arguments. First, it contends that the Debtors understate the clinical judgment and medical risks involved by painting "a false picture that people are simply being shuffled in and out of machines, with no information taken, evaluations made, or medical skills required." (*Id.* at 2). Second, the Trustee argues that the Debtors' descriptions of their operations contradict representations on the Debtors' own website, which indicate that their staff obtain detailed medical histories and engage

4

in evaluative processes beyond mere imaging.  (*Id.*)  Third, the Trustee maintains that the Debtors'

assertion that their Chapter 11 filings are "purely financial" and will not affect patient safety is an

"ex ante[,] conclus[ory]" statement "of no evidentiary value."  (*Id.*)

## III.    LEGAL STANDARD

Section 333(a)(1) of the Bankruptcy Code provides:

> If the debtor in a case under chapter 7, 9 or 11 is a health care business, the
> court shall order, not later than 30 days after the commencement of the case,
> the appointment of an ombudsman to monitor the quality of patient care and
> to represent the interests of the health care business unless the court finds
> that the appointment of such ombudsman is not necessary for the protection
> of patients under the specific facts of the case.

11 U.S.C. § 333(a)(1).  Compensation and reimbursement of such health care ombudsman is

allowable as an administrative expense under § 503(b)(2) of the Code.  *See* 11 U.S.C. § 503(b)(2).

Additionally, the Code defines a "health care business" as:

> (A) Any public or private entity (without regard to whether that entity is
>      organized for profit or not for profit) that is primarily engaged in
>      offering to the general public facilities and services for—
>      (i)  the diagnosis or treatment of injury, deformity or disease; and
>      (ii) surgical, drug treatment, psychiatric, or obstetric care; and
>
> (B) includes—
>      (i)  any— (I) general or specialized hospital; (II) ancillary ambulatory,
>           emergency, or surgical treatment facility; (III) hospice; (IV) home
>           health agency; and (V) other health care institution that is similar to
>           an entity referred to in subclause (I), (II), (III), or (IV); and
>      (ii) any long-term care facility, including any— (I) skilled nursing
>           facility; (II) intermediate care facility; (III) assisted living facility;
>           (IV) home for the aged; (V) domiciliary care facility; and (VI) health
>           care institution that is related to a facility referred to in subclause (I),
>           (II), (III), (IV), or (V), if that institution is primarily engaged in
>           offering room, board, laundry, or personal assistance with activities
>           of daily living and incidentals to activities of daily living.

11 U.S.C. § 101(27A).  Courts are divided on whether §§ 101(27A)(A) and (B) must be read

conjunctively—requiring a "health care business" to be both a medical service provider and an

inpatient facility—or whether § 101(27A)(A) alone suffices, with § 101(27A)(B) functioning as

an illustrative list.  *See, e.g.*, *In re Anne C. Barnes, D.D.S., P.L.L.C.*, 355 B.R. 532, 534-35 (Bankr. M.D.N.C. 2006) (finding that a debtor's dental practice was not a "health care business" because it "did not provide patients with shelter … in addition to medical treatment"); *In re 7-Hills Radiology, LLC*, 350 B.R. 902, 905 (Bankr. D. Nev. 2006) (applying the canon of *noscitur a sociis* to § 101(27A)(B) and finding that only businesses providing "direct and ongoing contact with patients to the point of providing them shelter and sustenance in addition to medical treatment" qualified as "health care businesses"); *but see In re Smiley Dental Arlington, P.L.L.C.*, 503 B.R. 680, 687 (Bankr. N.D. Tex. 2013) (declining to read the subsections conjunctively and holding that the "language in section 101(27A)(B) is inclusive of the specific entities listed and other similar entities, but not exclusive of other business entities meeting the test under section 101(27A)(A)").

In *Aknouk*, a bankruptcy court in this District held that reading §§ 101(27A)(A) and (B) disjunctively is the "more reasonable interpretation."  *In re Aknouk*, 648 B.R. 755, 761 (Bankr. S.D.N.Y. 2023).  To import an "inpatient services requirement" would "inappropriately curtail the reach of the statute, when there is nothing in the text to indicate that the statute should be read conjunctively."  *Id*. at 763.  The *Aknouk* court further held that the statute is unambiguous and thus canons like *noscitur a sociis* need not be invoked.  *See id.* (citing *Pfizer v. United States Dep't of Health and Human Servs*., 42 F.4th 67, 73-77 (2d Cir. 2022) (noting that canons of construction such as *noscitur a sociis* are only necessary where the meaning of a term is ambiguous according to the plain reading of the statute)).

In determining whether appointment of an ombudsman is necessary "under the specific facts of the case" as set forth in 11 U.S.C. § 333(a)(1), courts generally consider nine factors:

> (1) The cause of the bankruptcy;
> (2) The presence and role of licensing or supervising entities;
> (3) Debtor's past history of patient care;
> (4) The ability of the patients to protect their rights;

(5) The level of dependency of the patients on the facility;

(6) The likelihood of tension between the interests of the patients and the debtor;

(7) The potential injury to the patients if the debtor drastically reduced its level of care;

(8) The presence and sufficiency of internal safeguards to ensure appropriate level of care; and

(9) The impact of the cost of an ombudsman on the likelihood of a successful reorganization.

*Aknouk*, 648 B.R. at 761 (citing *In re Valley Health Sys.*, 381 B.R. 756, 761 (Bankr. C.D. Cal. 2008)).   These factors are non-exhaustive.   Some courts have considered additional factors, including "the debtor's financial ability to maintain high quality patient care," "the existence of an internal ombudsman program to protect the rights of patients," and "the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant."   *Valley Health*, 381 B.R. at 761.   "The weight to be accorded to each" factor is left to the court's "sound discretion."   *In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. 7, 10 (Bankr. E.D.N.Y. 2008).

## IV.   <u>ANALYSIS</u>

### A.  THE DEBTORS' STATUS AS A "HEALTH CARE BUSINESS"

The initial question presented is whether the Debtors fall within § 333(a)(1)'s ambit as a "health care business."   The Debtors' chief revenue officer, Mr. Lavrinoff, attests that UTA "does not engage in any health care business," and that the remaining Debtors operate only "outpatient radiologic clinics" that "do not admit patients, provide medical treatment, or prescribe medication."   (Dkt. No. 12,  Lavrinoff Declaration, ¶¶ 2-3).   The Trustee responds that a "health care business" under § 101(27A) does not require an inpatient component and that the Debtors' diagnostic services suffice.   (Dkt. No. 31).

7

To determine whether an entity is a "health care business" within the meaning of §
101(27A), courts apply a four-element framework: (1) the debtor must be "a public or private
entity"; (2) the debtor must be primarily engaged in offering services or facilities "to the general
public"; (3) those facilities and services offered must be "for the diagnosis or treatment of injury,
deformity or disease"; and (4) the facilities and services must be "for surgical care, drug treatment,
psychiatric care or obstetric care." *See Aknouk*, 648 B.R. at 760 (citing *In re Medical Associates
of Pinellas, L.L.C.*, 360 B.R. 356, 359 (Bankr. M.D. Fla. 2007)). "Courts are divided over the
existence of an implicit fifth [element]—whether a business is an inpatient facility." *Aknouk*, 648
B.R. at 760. However, as the court found in *Aknouk*, narrowing "health care business" to only
inpatient institutions is inconsistent with the plain meaning of the statute and contrary to
Congress's intent to define "health care business" in broad terms. *See id.*; *see also Smiley Dental*,
503 B.R. at 687 ("Requiring this judicially created element … misconstrues the statute").

The Court finds that all four elements are satisfied. The first element is not in dispute here.
As the court clarified in *Aknouk*, the requirement "that the debtor is a public or private entity …
includes 'almost every conceivable entity,' so the inquiry typically focuses on the last three
elements." *Aknouk*, 648 B.R. at 762 (citing *In re William L. Saber, M.D., P.C.*, 369 B.R. 631, 636
(Bankr. D. Colo. 2007)). This element is satisfied because the Debtors are undoubtedly private
entities. (Dkt. No. 1).

The second element is met because the Debtors are primarily engaged in offering services
to the general public. This element is met where "the patients can make appointments without the
assistance of a referring physician." *Aknouk*, 648 B.R. at 762 (citing *In re Alternate Family Care*,
377 B.R. 754, 757 (Bankr. S.D. Fla. 2007)). The fact that the Debtors maintain a website allowing
prospective patients to make appointments online is strong evidence that this second element is

8

satisfied. (Dkt. No. 31). *See Aknouk*, 648 B.R. at 762 ("The second [element] is satisfied …

because the [d]ebtor operates a website that advertises various services patients can obtain at [the]

[d]ebtor's facilities and encourages interested patients to call to book appointments."); *see also*

*Alternate Family Care*, 377 B.R. at 757 ("[T]he very presence of the website suggests that [the

debtor] has a public presence and … it is plausible to suggest that it is offering its services to the

general public.").

The third element—use of facilities or services for the diagnosis or treatment of "injury,

deformity or disease"—is also satisfied. *Aknouk*, 648 B.R. at 760 (citing 11 U.S.C. § 101(27A)).

This element is met where a debtor provides "'medically supervised treatment, whether or not it

involves pharmacological treatment' for patients' conditions but is not met if a debtor provides

solely administrative or procurement services for medical care facilities." *Id*. (quoting *Alternate

Family Care*, 377 B.R. at 758). Here, the Debtors perform diagnostic imaging, including X-ray,

MRI, and mammography, with licensed technologists operating sophisticated medical equipment

under established clinical protocols. (Dkt. No. 31, ¶ 6). Such diagnostic services are "medically

supervised" and integral to the treatment of diseases; they are not merely administrative or

procurement functions.

The fourth element is also met because the Debtors' facilities and services—outpatient

diagnostic imaging performed by licensed technologists—are routinely used for clinical care to

guide surgical interventions and other treatments. This element requires that the services and

facilities offered be "used for surgical care, drug treatment, psychiatric care or obstetric care." *See

Aknouk*, 648 B.R. at 760. Crucially, the statute requires only that the debtor's services be "used

for" diagnosis or treatment in one of the enumerated areas of clinical care; it does not demand that

the debtor itself perform surgery, dispense drugs, or provide psychiatric or obstetric care. *See

9

*Smiley Dental*, 503 B.R. at 687 (explaining that § 101(27A)(B)'s list is inclusive, not exclusive, of the entities meeting the § 101(27A)(A) criteria. Outpatient radiology and imaging centers such as the Debtors' facilities plainly qualify as institutions within the meaning of § 101(27A)(A). Their imaging services are routinely used by treating physicians in connection with surgical care and drug treatment, thereby satisfying the fourth element. (Dkt. No. 31, ¶ 6; Dkt. No. 24, ¶¶ 3, 12).

To the extent that the Debtors argue that they are not "health care businesses" because they lack an inpatient component, the Court is unpersuaded. In *Aknouk*, the court rejected reading an implicit "inpatient" element into § 101(27A), holding that neither the statute's text nor structure supports such a narrow interpretation. *See Aknouk*, 648 B.R. at 760. Courts elsewhere have likewise declined to read an inpatient requirement into § 101(27A). *See Smiley Dental*, 503 B.R. at 687-88; *see also In re La Familia Primary Care*, No. 23-10566, 2023 WL 5310817, at *5 (Bankr. D.N.M. Aug. 17, 2023) (citing *Aknouk*, 648 B.R. at 763 ("[T]he court declines to read an inpatient services requirement into the definition of a health care business in section 101(27A).")). Furthermore, two Debtors admitted in their Chapter 11 petitions that they operate a health care business. (*See* DDI Ch. 11 Petition, Dkt. No. 1; *see also* UIS Ch. 11 Petition, Dkt. No. 1). Under Bankruptcy Rule 1021, "[i]f a petition in a case under … Chapter 11 … state[s] that the debtor is a health care business, the case shall proceed as a case in which the debtor is a health care business." Fed. R. Bankr. P. 1021. Accordingly, the Court finds that each Debtor is a "health care business" within the meaning of § 101(27A) and § 333(a)(1).

## B.  THE NECESSITY OF A PATIENT CARE OMBUDSMAN

Having determined that the Debtors fall within the scope of § 333(a)(1) as a "health care business," the Court next considers whether the appointment of a patient care ombudsman is necessary. The Debtors bear "the burden of establishing that … [an] ombudsman 'is not necessary

for the protection of patients under the specific facts of the case.'" *Aknouk*, 648 B.R. at 764

(quoting 11 U.S.C. § 333(a)(1)). As discussed below, a majority of the factors enumerated in *Valley*

*Health* weigh in favor of appointing an ombudsman. *See Valley Health*, 381 B.R. at 761.

### Factor 1: The Cause of the Bankruptcy

The Court finds that this factor is neutral. In assessing this factor, courts consider whether

"the bankruptcy was precipitated by … deficient patient care or privacy concerns" that could

adversely affect patient welfare. *Valley Health*, 381 B.R. at 761. Where "the cause of … the

bankruptcy is something other than deficiencies … in patient care," this factor typically "weighs

against the appointment of an ombudsman." *In re Pediatrics at Whitlock, P.C.*, 507 B.R. 10, 11

(Bankr. N.D. Ga. 2014); *see also In re The Total Woman Healthcare Center P.C.*, No. 06-52000,

2006 WL 3708164, at *2 (Bankr. M.D. Ga. Dec. 14, 2006) (declining appointment where the

debtor's liabilities arose from taxes rather than deficient patient care); *Smiley Dental*, 503 B.R. at

689 (finding an ombudsman unnecessary where the bankruptcy was caused by "cash flow

problems resulting from changes to Medicare reimbursement practices for orthodontics").

The record reflects that neither the Debtors nor the Trustee has made a persuasive

evidentiary showing tracing the bankruptcy to lapses in patient care. The Debtors assert in general

terms that their bankruptcy is "purely financial" and resulted from "structural reimbursement and

regulatory shocks." (Dkt. No. 12, ¶ 8; *see also* Rule 1007 Statement, Dkt. No. 24, ¶ 4). The

Trustee, on the other hand, challenges the Debtors' portrayal as incomplete; yet it offers no

countervailing proof that patient-care deficiencies precipitated the filing. (Dkt. No. 31). There is

no indication in the record that any reportable medical incidents preceded the Debtors' petitions.

It appears that no malpractice claims have been filed against the Debtors. *See Whitlock*, 507 B.R.

at 11 (finding that the first factor weighs against appointment where "no claims have been made

against the [d]ebtor's malpractice insurance" and "the [d]ebtor was unaware of any professional

malpractice claims, or incidents that could result in claims, against anyone associated with the [d]ebtor"). On this limited showing, the Court cannot conclude that patient-care deficiencies caused or contributed to the bankruptcy.

### Factor 2: The Presence and Role of Licensing or Supervising Entities

The Court finds that this factor weighs in favor of appointment. Courts consider whether the debtor is "subject to substantial monitoring by … federal and state regulatory agencies [or] independent accreditation associations." *Valley Health*, 381 B.R. at 761-62. In *Aknouk*, the court denied appointment where the record showed that the debtor had robust external guardrails: its clinicians were subject to "continuing education [requirements] to ensure that they are up to date on the latest skills, treatments, techniques, and developments in the industry," and the debtor's facilities were "inspected regularly by the New York State" health authorities. *Aknouk*, 648 B.R. at 764.

The record here indicates that the Debtors do not have comparable oversight. Although the Debtors are licensed by the New York State Department of Health, they identify no current third-party accreditations, no recent state or federal health survey results, and no external quality audits addressing imaging-specific risks (such as radiation safety for X-ray and mammography, MRI safety screening, technologist credentialing and continuing education, equipment quality, or HIPAA and privacy safeguards). (Dkt. No. 31, at 7). Nor have the Debtors submitted affidavits from a medical director describing ongoing compliance programs that could substitute for independent monitoring. (*Id*.) To the extent that state licensure requires supervision of the Debtors' imaging services by a physician, the Debtors have not identified the supervising physicians, their qualifications, or their operational roles. (*Id*.) A bare assertion that imaging is "non-invasive" and "performed by licensed technologists," without evidence of independent supervisory structures, does not establish the kind of "substantial monitoring" that weighed against

12

appointment in *Aknouk*.  (Dkt. No. 12, ¶¶ 11-12).  *See Aknouk*, 648 B.R. at 764.  Accordingly, this factor supports appointment of an ombudsman to ensure patient safety during the pendency of the Debtors' bankruptcy.

### Factors 3, 4 & 5: The Debtors' Past History of Patient Care; The Ability of Patients to Protect Their Rights; The Level of Dependency of Patients on the Facility

The Court finds that the third, fourth, and fifth factors weigh in favor of appointment.  With respect to past history and the patients' ability to protect their rights, courts consider whether the debtor "has a history of compromis[ing] patient care or rights."  *Aknouk*, 648 B.R. at 764.  Courts also consider whether the debtor maintains "internal quality controls and procedures for monitoring patient care at its facilities."  *Valley Health*, 381 B.R. at 762.  The record contains no documented instances of malpractice or regulatory sanctions, or any compromise of patient care or rights by the Debtors.  However, the absence of reported incidents is not a substitute for a robust internal quality control program.  While the Debtors have offered generalized assurances, they have provided no policies, audits, accreditation materials, or affidavits from a medical director demonstrating ongoing quality oversight.  (Dkt. No. 12, ¶¶ 11-12, 18).  The Debtors have failed to carry their burden of demonstrating that they possess the requisite facilities or personnel to safeguard the patients' rights.

As to the level of dependency of the patients on the Debtors' facilities (the fifth factor), the Court finds that appointment of an ombudsman is necessary.  In *Aknouk*, the court declined appointment where the patients did not meaningfully depend on the debtor's facilities where the debtor "is an entirely an outpatient facility."  *Aknouk*, 648 B.R. at 765; *see also In re Mississippi Maternal-Fetal Medicine, P.A.*, No. 21-0091, 2021 WL 1941627, at *3 (Bankr. S.D. Miss. Feb. 18, 2021) ("The risk to patient care is lessened further by the [d]ebtor's role in only providing outpatient care instead of a continuity of day-to-day care.").  However, *Aknouk* did not hold that

outpatient status conclusively establishes low level of provider dependency. Rather, consistent with *Aknouk*, courts assess the particular facts of each case, including whether comparable services are readily available from alternative providers in the community. *See Aknouk*, 648 B.R. at 765; *see also Smiley Dental*, 503 B.R. at 689 (finding a low level of provider dependency where dental patients have access to their medical records and the nature of a dental clinic is such that a patient may "seek alternate dental or orthodontic care" at other locations if he or she so chooses).

Measured against that standard, the Court finds that the Debtors' patient population is meaningfully dependent on the Debtors' facilities and services. The Court agrees with the Trustee that, unlike the routine dental and orthodontic services at issue in *Smiley Dental*—where patients could readily "seek alternate care" in other locations—the Debtors here provide physician-directed diagnostic imaging that is frequently time-sensitive and integral to surgical planning. (Dkt. No. 31, at 8). The record reflects that the Debtors' services may include "invasive injections of contrast dyes, medical evaluation of patients, and the preparation of reports by a qualified radiologist." (*Id*.) Furthermore, diagnostic imaging is patient-specific and often integrated into ongoing physician treatment, making a change in provider potentially burdensome. (*Id*.) Substituting providers is therefore not a simple matter of scheduling a new appointment. (*Id*.) It frequently entails new insurer authorizations, repeating medical studies to meet radiologist or surgeon requirements, and renewed clinical intake. (*Id*.) Disruptions can therefore significantly increase the risk of delayed diagnosis. (*Id*.) These features distinguish the Debtors' services from those considered in *Smiley Dental*.

The Trustee also persuasively notes that that the Debtors have historically "served as a 'local option' for working-class residents who cannot afford or navigate a four-month wait at a major hospital for an MRI on an injured knee." (Dkt. No. 31, at 7-8). The Debtors' presence in

the community is strong evidence that the local neighborhood depends on the Debtors' facilities

and services. (*Id.* at 8). A significant curtailment of services would likely displace patients to

distant facilities, delaying diagnosis and treatment. (*Id.*) These circumstances demonstrate a

meaningful level of dependency by the patient population on the Debtors' facilities. This factor

weighs in favor of appointment.

### Factor 6: The Likelihood of Tension Between the Interests of the Patients and the Debtors

The Court finds that this factor is neutral. The key inquiry is "whether a decline in patient

care would help [a] [d]ebtor's reorganization." *Whitlock*, 507 B.R. at 11. Courts consider, among

other things, whether the case was precipitated by "deficient patient care or an inability to pay

vendors and suppliers who are critical to patient care." *Aknouk*, 648 B.R. at 765; *see also Smiley

Dental*, 503 B.R. at 689 ("Because malpractice does not appear to have caused the bankruptcy, no

likelihood of tension between the interests of the patients and the Debtors appears to exist."").

Courts also recognize that providers generally have strong incentives to maintain high-quality

services, since providing substandard care can jeopardize patient relationships, referral sources,

and licensure. *See Flagship Franchises of Minnesota, LLC*, 484 B.R. 759, 764 (Bankr. D. Minn.

2013) (finding no tension because, "[w]ithout the high standard of care, clients would not use the

services and the [d]ebtor would lose its licenses").

The record does not show substandard care caused the Debtors' bankruptcy or that reducing

care would advance reorganization. No malpractice claims have been filed, and nothing suggests

that sacrificing service quality would yield a net benefit to the Debtors' reorganization in light of

the attendant regulatory, operational, and revenue risks. At the same time, the Debtors' liquidity

constraints could, in theory, create pressures to reduce staffing, defer maintenance, and impact

treatment, causing risks to patient experience and safety. (Dkt. No. 31, at 2). Neither the Debtors

nor the Trustee has offered sufficient evidence for the Court to make an overall determination as to whether there is any likelihood of tension between the interests of the patients and the Debtors. Thus, this factor neither weighs in favor of nor against appointment.

**Factor 7: The Potential Injury to the Patients If the Debtors Drastically Reduce Their Level of Care**

The Court finds that this factor weighs against appointment. "[C]ourts typically find this factor to weigh in favor of [appointment] … where the [d]ebtor is a long-term care facility or hospital that performs a high volume of inpatient procedures." *Aknouk*, 648 B.R. at 765 (citing *Valley Health*, 381 B.R. at 764). In *Valley Health*, the court found the seventh factor in favor of appointment because the sensitive and inpatient nature of the debtor's patient services meant that "a drastic reduction in quality of care [could] create a significant risk for patients" and that any "cessation of operations at one of the [d]ebtor's hospitals would require a transfer of patients to another facility." *Valley Health*, 381 B.R. at 764. Similarly, in *Alternate Family Care*, which involved an inpatient psychiatric facility for children, the court concluded that an ombudsman was necessary because a reduction in service quality would require children to be relocated, likely causing severe trauma and disruption. *See Alternate Family Care*, 377 B.R. at 760.

The circumstances that informed *Valley Health* and *Alternate Family Care* are absent here. The Debtors operate outpatient diagnostic imaging centers. They do not provide inpatient services, administer medications, or deliver inhouse treatment. (Dkt. No. 12, Lavrinoff Declaration, ¶¶ 2-3). Nothing in the record shows that a reduction in the Debtors' service levels would require the emergent transfer of admitted patients or interrupt continuous medical operations of the kind in *Valley Health* or *Alternate Family Care*. While diagnostic delay can be consequential in individual cases, the nature of the Debtors' services and the absence of an inpatient component materially

16

diminish the likelihood of immediate, severe patient injury from a rapid reduction in service quality.  Therefore, the potential-injury factor weighs against appointment.

>    **Factors 8 & 9: The Presence and Sufficiency of Internal Safeguards To Ensure Appropriate Level of Care; The Impact of the Cost of an Ombudsman on the Likelihood of a Successful Reorganization**

The Court finds that both the eighth and ninth factors weigh in favor of appointment.  In *Aknouk*, the Court declined to appoint an ombudsman where the debtor demonstrated "sufficient internal mechanism[s] … to monitor patient care and resolve complaints," including documented safety certifications, periodic governmental equipment inspections, and specific radiation-safety and infection-control practices.  *Aknouk*, 648 B.R. at 766.  Here, by contrast, the Debtors have made no comparable showing.  The Debtors have not submitted policies, procedures, or affidavits identifying a medical director, radiation-safety officer, or MRI-safety protocol.  (Dkt. No. 31, at 7).  They have also not submitted any documents indicating the existence of quality-assurance procedures, patient-complaint resolution mechanisms, or any other information indicating sufficient internal safety-controls.  (*Id.*)

With regards to the cost of appointment (the ninth factor), the Debtors have likewise failed to carry their burden.  The Debtors assert in general terms that appointment of an ombudsman would impose "unnecessary administrative costs," but they provide no quantification, no projected budget impact, and no explanation of how the expense would impair their reorganization efforts. On this record, the Court cannot find that the expense of an ombudsman would meaningfully impair the Debtors' reorganization prospects, particularly where the Debtors already filed a proposed reorganization plan on November 13, 2025.  (Dkt. No. 14).  Because the Debtors have not shown either robust internal safeguards or a concrete appointment cost to outweigh the statutory protections of § 333(a)(1), these factors favor appointment.

17

The Court thus finds that six of the nine *Valley Health* factors weigh in favor of appointment (factors two, three, four, five, eight, and nine), one factor weighs against appointment (factor seven), and two factors are neutral (factors one and six).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the appointment of a patient care ombudsman is necessary.  Accordingly, the Motion is **DENIED**.

**IT IS SO ORDERED**.

Dated:  January 8, 2026
        New York, New York                    /s/ John P. Mastando III
                                              HONORABLE JOHN P. MASTANDO III
                                              UNITED STATES BANKRUPTCY JUDGE